[Crim. No. 23605. Mar. 11, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
MARIA J. CASTRO, Defendant and Appellant.

302

304

**COUNSEL**

Richard A. Lieberman, under appointment by the Supreme Court, Howard J. Berman and Berman & Glenn for Defendant and Appellant.

Quin Denvir, State Public Defender, and Jonathan B. Steiner, Chief Assistant State Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Eugene W. Kaster, Clifford K. Thompson, Jr. and David D. Salmon, Deputy Attorneys General, for Plaintiff and Respondent.

Christopher N. Heard as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**KAUS, J.**—A jury convicted defendant Maria Castro of receiving stolen property (Pen. Code, § 496). Before trial, the court denied a motion to bar impeachment with then unspecified priors, should defendant choose to testify. The court based its ruling on article I, section 28, subdivision (f) of the California Constitution,[1] concluding that it was more specific than subdivision (d)[2] and, therefore, controlled.[3] The issues on appeal are (1) whether the court erred in ruling that defendant could be impeached with what proved to be prior convictions of possession of heroin and possession of heroin for sale, and (2) whether the error, if any, was prejudicial.

 Defendant contends that article I, section 28, subdivision (f) of the Constitution—enacted in 1982 as part of the so-called Victims' Bill of Rights (Proposition 8)—did not eliminate Evidence Code section 352 as a basis for

---

[1]Section 28, subdivision (f) provides: "Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding. When a prior felony conviction is an element of any felony offense, it shall be proven to the trier of fact in open court."

[2]Subdivision (d) provides: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. *Nothing in this section shall affect* any existing statutory rule of evidence relating to privilege or hearsay, or *Evidence Code, Sections 352,* 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press." (Italics added.)

[3]The trial court commented: "I'm going to deny the motion, and I'll explain why . . . Subsection (f) says that prior convictions are admissible, notwithstanding any other limitations of law. Subsection (d) says . . . that Section 352 applies to everything within the section. I believe that it is very poorly written, and either (d) controls (f), or (f) controls (d), and since (f) is more specific and refers only to the prior conviction issue, I'm going to hold that prior convictions are admissible. However, I hope and I'm sure that it will happen that the Court of Appeals will resolve this discrepancy in the law."

excluding evidence of prior convictions. She also claims that to apply the subdivision to erase the trial court's authority to exclude evidence of priors in criminal proceedings denies equal protection. As amicus curiae, the State Public Defender argues that the automatic admission of all prior felony convictions for impeachment under subdivision (f) is a denial of due process.

The Attorney General responds that the voters intended subdivision (f) to abolish all judicial discretion to restrict admission of prior convictions for impeachment and to require the admission of all such evidence subject only to federal constitutional restraints. It is also urged that admission of defendant's prior convictions did not deny due process or equal protection.

The legislative and judicial history of sections 352 and 788, the circumstances under which article I, section 28, was enacted, the language of the enactment—concededly ambiguous—as well as certain policy considerations convince us that section 28 was not intended to abrogate the traditional and inherent power of the trial court to control the admission of evidence by the exercise of discretion to exclude marginally relevant but prejudicial matter—as, indeed, is provided by Evidence Code section 352.[4]

■ A further issue—tendered by the nature of defendant's convictions and subdivision (d)'s recognition that only relevant evidence is admissible— is the nature of the prior convictions which may be used for impeachment of witnesses in criminal cases. We shall hold that—always subject to the trial court's discretion under section 352—subdivision (f) authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty. On the other hand, subdivision (d), as well as due process, forbids the use of convictions of felonies which do not necessarily involve moral turpitude.

■ One vital point which must be made at the outset is this: Although the majority of decisions examining the use of prior convictions for impeachment of witnesses in criminal cases has involved situations in which the defendant himself was the witness, subdivision (f) is by no means confined to that situation, but applies to all witnesses—the prosecution's, the defense's, as well as the court's own.

I

The history of section 352 compels the conclusion that at least until the adoption of section 28, section 352 was intended to apply across the board,

---

[4]Section 352 reads: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

excluding no relevant and otherwise admissible evidence from judicial weighing of prejudice against probative value. (For a review of the genesis of § 352, see *People* v. *House* (1970) 12 Cal.App.3d 756 [90 Cal.Rptr. 831], conc. opn., pp. 769-771.) Early decisions of the Courts of Appeal, however, did not recognize the full import of section 352 and, in a series of cases later disapproved in *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], held that section 788 of the Evidence Code was immune to the exercise of discretion under section 352.[5] In *Beagle* we confirmed that section 352 did, indeed, apply to all relevant evidence and that the general rule that a judge may exclude evidence when its probative value is outweighed by the risk of undue prejudice, codified in section 352, was applicable to evidence of prior convictions to impeach: "We find nothing in the statutory language to exempt section 788 from the general evidentiary provisions *applicable to all rules of admissibility,* and conclude that when sections 788 and 352 are read together they clearly provide discretion to the trial judge to exclude evidence of prior felony convictions when their probative value on credibility is outweighed by the risk of undue prejudice." (*Id.,* 6 Cal.3d at pp. 452-453; italics added.)

Although *Beagle* made it clear that we did not intend to establish rigid standards to govern the exercise of discretion, the opinion did rely on *Gordon* v. *United States* (D.C.Cir. 1967) 383 F.2d 936, 940-941, for certain suggested factors to be considered in the exercise of discretion—namely, (1) whether the prior conviction reflects on honesty and integrity; (2) whether it is near or remote in time; (3) whether it was suffered for the same or substantially similar conduct for which the witness-accused is on trial; and, (4) finally, what effect admission would have on the defendant's decision to testify. We expressly recognized that the trial court's decision was dependent on "sound" judicial discretion and, in fact, affirmed Beagle's conviction, holding that the trial court had not erred in admitting a prior conviction to impeach.

Thereafter, in recognition of the fact that no discretion is so unbounded that it cannot be abused (e.g., *People* v. *Malloy* (1974) 41 Cal.App.3d 944, 952 [116 Cal.Rptr. 592]), we handed down a series of decisions delineating the boundaries of permissible discretion.

In *People* v. *Antick* (1975) 15 Cal.3d 79 [123 Cal.Rptr. 475, 539 P.2d 43], the first case to apply the *Beagle* "guidelines," we found an abuse of discretion in the admission of prior convictions because of their remoteness.

---

[5]Section 788 provides in pertinent part: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony . . . ." What the Courts of Appeal failed to consider was that section 788 was enacted merely as an exception to the rule of exclusion in section 787 which prohibits evidence of specific instances of conduct to impeach or rehabilitate a witness.

In *People* v. *Rist* (1976) 16 Cal.3d 211, 218-223 [127 Cal.Rptr. 457, 545 P.2d 833], a robbery prosecution, we found an abuse of discretion in the admission of a prior robbery conviction suffered by defendant five months before trial, where two other dissimilar priors were available—one a two-year-old conviction of credit card forgery.

In *People* v. *Rollo* (1977) 20 Cal.3d 109 [141 Cal.Rptr. 177, 569 P.2d 771], we found error where, in a prosecution for receiving stolen goods, the court admitted only the fact of the prior, leaving to defendant the option of disclosing its nature (solicitation of murder).

In *People* v. *Woodard* (1979) 23 Cal.3d 329 [152 Cal.Rptr. 536, 590 P.2d 391], our first—and so far only—case involving a nonparty witness' priors, we held that the court should have exercised its discretion under section 352; further, since neither prior (voluntary manslaughter and felon in possession of firearm) had any bearing on truthfulness, they should have been excluded.

In *People* v. *Fries* (1979) 24 Cal.3d 222 [155 Cal.Rptr. 194, 594 P.2d 19], we found an abuse of discretion where a robbery prior was admitted to impeach a defendant accused of robbery.

In *People* v. *Spearman* (1979) 25 Cal.3d 107 [157 Cal.Rptr. 883, 599 P.2d 74], we found an abuse of discretion in the admission of an identical narcotic prior which was not relevant to credibility.

And, lastly, in *People* v. *Barrick* (1982) 33 Cal.3d 115 [187 Cal.Rptr. 716, 654 P.2d 1243], we held that in a case charging auto theft, the trial court erred in "sanitizing" a prior auto theft conviction by calling it a "felony involving theft."

In each of the cases, a dissenting opinion disputed the result on the issue of the trial court's abuse of discretion. More important, however, the dissents expressed a minority view that the guidelines of *Beagle* had, in fact, become rigid limitations on the discretion of the trial court.

It was against the backdrop of the controversies raised by the *Antick* line of cases (excepting *Barrick,* decided in Dec. 1982) that article I, section 28 was framed. Whether or not we were correct in our interpretation of section 788 and in limiting the discretion of the trial court, there seems to be little doubt that the drafters of section 28 wanted a change and that the voters legislated it.

The question is, did they intend to throw out the baby with the bath? Assuming that the framers and voters were attempting to revitalize section

788 to counter the effect of the *Antick* line of cases, as decried by the dissenters, is there hard evidence that they intended to go further—to abrogate entirely the discretion of the trial court under section 352, a traditional, inherent and, in truth, indispensable tool of the law of evidence? (*Smith* v. *Lewis* (1975) 13 Cal.3d 349, 364 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231]; *Adkins* v. *Brett* (1920) 184 Cal. 252, 258-259 [193 P.251]; *People* ex rel. *Dep. Pub. Wks.* v. *Princess Park Estates, Inc.* (1969) 270 Cal.App.2d 876, 885 [76 Cal.Rptr. 120].)

It must be reemphasized that subdivision (f) applies to all witnesses in criminal cases. Did the drafters really intend that *all* persons who choose or are compelled to testify, either for the defense or the prosecution, will inevitably be impeachable by prior convictions? Did they really intend that an elderly victim of a mugging cannot avoid being impeached by a conviction for conspiracy to disturb the peace (Pen. Code, §§ 182, 415) suffered in her youth? Did the framers really intend that a witness to a crime who, as a good citizen, comes forward to aid the police, must anticipate that any felony conviction suffered years before will be used against him if he testifies at a criminal trial? ■ The prosecutor, of course, must disclose the prior criminal record of prosecution witnesses (*In re Ferguson* (1971) 5 Cal.3d 525 [96 Cal.Rptr. 594, 487 P.2d 1234]). If the framers intended that the trial court was to have no discretion to prevent impeachment with ancient offenses, have they not—to switch metaphors—cut off their noses to spite their faces? Even convicted felons may make a contribution to the search for truth.

These considerations are disturbing, but putting them aside for a moment we examine the enactment itself to determine whether the drafters intended to abolish the trial court's power under section 352 or merely to revert to the rule that, subject to trial court discretion, priors are admissible to impeach. On its face, section 28 contains two subdivisions which need reconciling. Subdivision (d) states that "relevant evidence *shall not be excluded* in any criminal proceeding . . ." but that "[n]othing in this *section* shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103." (Our italics.) Subdivision (f) provides in pertinent part: "any prior felony conviction of any person in any criminal proceeding . . . *shall* subsequently *be used without limitation* for purposes of impeachment or enhancement of sentence in any criminal proceeding." (Our italics.)

■ For resolution of the conflict we invoke settled principles of statutory construction. We are directed first to the "words themselves" (*People* v. *Black* (1982) 32 Cal.3d 1, 5 [184 Cal.Rptr. 454, 648 P.2d 104]) and cau-

tioned to give to them their ordinary and generally accepted meaning. (*In re Quinn* (1973) 35 Cal.App.3d 473 [110 Cal.Rptr. 881].)

■ As the People note, subdivision (f) seems clear and absolute in its language—"any" means "any" and "without limitation" means "without limitation," leaving no room for an interpretation which would preserve judicial discretion. On the other hand the Evidence Code is full of positive rules of admissibility, all of which are subject to section 352. (*People* v. *House, supra,* 12 Cal.App.3d 756, 771-772 (conc. opn.).) Most important of all, however, is the precise wording of the relevant passage in subdivision (d) relating to the preservation of section 352: "Nothing in this *section* shall affect . . . Evidence Code Sections 352, 782 or 1103." (Our italics.) Of course, "this section" includes all of section 28 of article I, particularly, for present purposes, subdivision (f). The People attempt to escape from this plainest of meanings, by claiming—to put it bluntly—poor draftsmanship. While we may grant that in some instances the word "section" as used in Proposition 8 *may* mean "subdivision," in other instances such an interpretation would be absurd.[6]

So much for the words of section 28. We look next to the extrinsic evidence. "[W]hen, as here, the enactment follows voter approval, the ballot summary and arguments and analysis presented to the electorate in connection with a particular measure may be helpful in determining the probable meaning of uncertain language." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].) The voter's pamphlet provides little aid in the determination whether the enactment was intended to abrogate or preserve the trial court's discretion under section 352. The preamble (§ 28, subd. (a)) states that the goal of "highest importance" was that "persons who commit felonious acts causing injury to innocent victims will be appropriately detained in custody, tried by the courts, and sufficiently punished so that the public safety is protected and encouraged," and to accomplish the goal "broad reforms in the procedural treatment of accused persons and the disposition and sentencing of convicted persons are necessary and proper as deterrents to criminal behavior . . . ."

According to the legislative analysis found in the pamphlet, "The measure would amend the State Constitution to require that information about prior

---

[6]Obviously the word "section" as used in subdivisions (b) and (e) of section 667 of the Penal Code—also part of Proposition 8—can only mean "section." On the other hand, in subdivision (b) of section 28—dealing with restitution—it is provided that "The Legislature shall adopt provisions to implement this section during the calendar year following adoption of this section." Apparently the first "section" in that sentence should read "subdivision." There is, however, no rule of statutory construction to the effect that one instance of sloppy draftsmanship compels courts to presume a habit.

felony convictions be used without limitation to discredit the testimony of a witness, including that of a defendant. *Under current law, such information may be used only under limited circumstances.*" (Analysis by the Legis. Analyst, Ballot Pamp., Proposed Amend. to Cal. Const., Primary Elec. (June 8, 1982) p. 54; italics added.)

In our view, the last sentence is a clear reference to the *Antick* line of cases, not to Evidence Code section 352. The arguments of the proponents and opponents in the voter's pamphlet make no specific reference to the matter which concerns us here. One of the proponents suggested that "higher courts" had created additional rights for criminals and restricted law enforcement officers. (*Id.* at p. 34.) It was also argued that the initiative would "result in more criminal convictions" and thereby reverse the perceived trend that "our courts and professional politicians in Sacramento have demonstrated more concern with the rights of criminals than with the rights of innocent victims." (*Id.* at p. 34.) We get no clue as to the framers' or voters' intention to abrogate or preserve section 352 discretion in the trial court or, as we suggest, their intention to revitalize section 788 to reestablish the general rule that priors are to be admitted for impeachment purposes.

The People and some Courts of Appeal, attempting to resolve the apparent conflict between subdivisions (d) and (f), have considered certain extrinsic evidence which we consider inappropriate. One of the aids to statutory interpretation is what has been called "legislative-administrative" construction. (*Amador Valley Joint Union, supra,* 22 Cal.3d at p. 246.) When an ambiguous statute or other enactment is implemented by the Legislature or construed by an administrative agency by the adoption of extensive regulations, the courts have traditionally accorded great weight to the legislative and administrative implementations in construing the enactment. (*Amador Valley Joint Union, supra,* 22 Cal.3d at p. 246; *State of South Dakota* v. *Brown* (1978) 20 Cal.3d 765, 777 [144 Cal.Rptr. 758, 576 P.2d 473].) The pronouncements relied on here do not fall into this category. In one instance, they are the opinion of the Attorney General that "section 352 cannot limit the constitutional mandate of subdivision (f) that priors may be used for impeachment without limitation." (Attorney General's Guide to Proposition 8 (June 9, 1982), reprinted in Cont.Ed.Bar Program Material, Criminal Practice After Proposition 8 (July 1982) at pp. 245-248.) Distributed after the election of June 8, 1982, there is no indication whatever that the voters were cognizant of the Attorney General's opinion.

Other opinions which the People and the courts have relied on to determine the intent of the framers and voters are the majority and minority reports issued by the Assembly Committee on Criminal Justice. (Assem.

Com. on Crim. J., Analysis of Proposition 8, The Criminal Justice Initiative (Mar. 24, 1982).) The majority report explained: "The purpose of the initiative proposition is to require use of prior felony convictions against a criminal defendant if he chooses to testify. . . . The initiative requires use of prior felony convictions no matter how remote, whether or not the crime is related to truthfulness and regardless of whether the offense has since been decriminalized or reduced to a misdemeanor." (*Id.*, at p. 30.) The report added that "[t]he initiative would require the use of prior felony convictions for impeachment purposes even though the probative value is outweighed by the danger of substantial prejudice." (*Id.*, at p. 31.) The minority members of the committee issued a publication in response stating that subdivision (f) " 'will end the abuse of justice associated with the prohibition against presenting to the jury felony records of witnesses. . . .' (In Defense of the Victims of Crime, An Analysis of Proposition 8, The Criminal Justice Initiative (Mar. 24, 1982) p. 18.)"

The reports represent the opinions or understandings of individuals who happen to be legislators but who were not drafters of the proposed initiative. These opinions, of themselves, do not provide aid in determining the intent of the electorate. (See *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699-700 [170 Cal.Rptr. 817, 621 P.2d 856].) None of the opinions was distributed to the electorate by way of the voter's pamphlet, and we can only speculate on the extent to which the voters were cognizant of them.

The fact is that there is no indication from the extrinsic evidence that the drafters were aware of, or that the electorate was tuned to, the apparent conflict in the language of subdivisions (d) and (f). It remains for us to harmonize or reconcile, if possible, the two subdivisions without repealing one or the other.

The intention of the drafters of the initiative was to restore trial court discretion as visualized by the Evidence Code and to reject the rigid, black letter rules of exclusion which we had grafted onto the code by the *Antick* line of decisions. Our conclusion is based on the historical context of subdivisions (d) and (f) of section 28. The dissatisfaction of the proponents with the appellate courts was expressed in the literature that supported the initiative. It was also expressed in the mandatory nature of the language of the subdivisions ("relevant evidence shall not be excluded" in subd. (d) and prior convictions "shall . . . be used" in subd. (f)). Nevertheless, the initiative itself expressed continued trust in the discretion of the trial courts; despite the mandatory admonitions, that discretion under section 352 was expressly retained.

Our resolution accords with policy considerations described earlier which suggest that the trial court should not be stripped of all discretion in ruling on the admissibility of evidence, and, most importantly, our resolution eliminates the conflict between subdivision (d) and subdivision (f), gives meaning to both, and, besides, "steers clear of constitutional obstacles." (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 152 [197 Cal.Rptr. 79, 672 P.2d 862]; see also *People* v. *Smith* (1983) 34 Cal.3d 251, 259 [193 Cal.Rptr. 692, 667 P.2d 149] and *In re Jacqueline H.* (1978) 21 Cal.3d 170, 178 [145 Cal.Rptr. 548, 577 P.2d 683].)

## II

### A.

■ Having determined that subdivision (f) did not abolish trial court discretion with respect to felony-impeachment, we turn to the next question: Subject to such discretion, what felonies are admissible to affect the credit of a witness?

The answer given by subdivision (f) is simple enough: "Any prior felony conviction . . . shall . . . be used without limitation for purposes of impeachment . . . ." Since we are dealing with a state constitutional mandate, we can safely ignore section 350 of the Evidence Code to the effect that "[n]o evidence is admissible except relevant evidence." What we cannot ignore, however, is the due process clause of the Fourteenth Amendment which, as interpreted by the United States Supreme Court, demands that even inferences—not just presumptions—be based on a rational connection between the fact proved and the fact to be inferred. (*Ulster County Court* v. *Allen* (1979) 442 U.S. 140, 157 [60 L.Ed.2d 777, 792, 99 S.Ct. 2213]; *Barnes* v. *United States* (1973) 412 U.S. 837, 844-845 [37 L.Ed.2d 380, 387, 93 S.Ct. 2357]; *Leary* v. *United States* (1969) 395 U.S. 6, 46 [23 L.Ed.2d 57, 87, 89 S.Ct. 1532]; cf. *People* v. *Roder* (1983) 33 Cal.3d 491, 497-498 [189 Cal.Rptr. 501, 658 P.2d 1302].) In *Barnes, supra,* 412 U.S. 837, the court reiterated that "[c]ommon-law inferences, like their statutory counterparts, must satisfy due process standards in light of present-day experience." (*Id.* at pp. 844-845 [37 L.Ed.2d at p. 387].) Paraphrasing the question to be asked—as formulated in *Leary, supra,* 395 U.S. 6—we must ask with respect to any particular felony conviction which is offered for impeachment: "Can it be said with substantial assurance that the credibility of a witness is adversely affected by his having suffered this conviction?" ■ If the answer is "no," impeachment is prohibited by due process: "An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence."

(*Bruton* v. *United States* (1968) 391 U.S. 123, 131, fn. 6 [20 L.Ed.2d 476, 482, 88 S.Ct. 1620].)

 Thus, while the historical basis for felony impeachment may well be the common law rule that a person convicted of any felony was totally incompetent as a witness (McCormick on Evidence (3d ed. 1984) § 43, p. 93), the modern justification for the practice must be that prior felony convictions may, somehow, be relevant to the witness' veracity. It is, therefore, appropriate that we remind ourselves of the precise progression of inferences which may lead a trier of fact to conclude that proof of a felony conviction may affect the credibility of a witness. The classic statement of the rationale for felony impeachment is that of Justice Holmes, written when he was still a member of the Supreme Judicial Court of Massachusetts: "[W]hen it is proved that a witness has been convicted of crime, the only ground for disbelieving him which such proof affords is the *general readiness to do evil* which the conviction may be supposed to show. It is from that general disposition alone that the jury is asked to infer a readiness to lie in a particular case, and thence that he has lied in fact. The evidence has no tendency to prove that he was mistaken, but only that he has perjured himself, and it reaches that conclusion solely through the general proposition that he is of *bad character* and unworthy of credit." (*Gertz* v. *Fitchburg Railroad* (1884) 137 Mass. 77, 78; italics added.)

The People point to no other rational justification for felony impeachment. It follows, therefore, that if the felony of which the witness has been convicted does not show a "readiness to do evil," the fact of conviction simply will not support an inference of readiness to lie. We make no attempt to list or even further define such felonies. At this point it is enough to note that the codes are littered with them, if only because in this state it is a felony to conspire to commit a misdemeanor. (Pen. Code, § 182.)[7]

Since impeachment with felony convictions which do not involve "readiness to do evil"—moral turpitude, if you will—bears no rational relation to the witness' readiness to lie, the due process clause of the Fourteenth Amendment necessarily cuts into the "without limitation" language of subdivision (f).[8]

---

[7] What moral turpitude follows from a conviction of conspiracy to tattoo a person under 18? (Pen. Code, § 653.)

[8] A frequently cited case for the proposition that any felony conviction is impeaching is that of the Supreme Court of Washington in *State* v. *Ruzicka* (1977) 89 Wn.2d 217 [570 P.2d 1208, 1212]. There the court held that the Legislature could reasonably determine that there was a nexus between a person having committed crimes and that person's propensity to lie. To the extent that this statement encompasses crimes not involving moral turpitude of any kind, we must disagree on due process grounds.

Far more controversial than the elimination of felony convictions which do not denote moral turpitude of any kind is the use of convictions of crimes which involve moral depravity other than dishonesty: child molestation, crimes of violence, torture, brutality and so on.

While the case in which Justice Holmes explained the rational basis for felony impeachment did involve a prior conviction of a crime which implied dishonesty—"falsely personating" a United States revenue officer—Holmes' reasoning does not depend on dishonesty being an element of the felony. Obviously it is easier to infer that a witness is lying if the felony of which he has been convicted involves dishonesty as a necessary element than when it merely indicates a "bad character" and "general readiness to do evil." Nevertheless, it is undeniable that a witness' moral depravity of any kind has some "tendency in reason" (Evid. Code, § 210) to shake one's confidence in his honesty. We ourselves recognized this in *People* v. *Rist, supra,* where we said that "convictions which are assaultive in nature do not weigh as heavily in the balance favoring admissibility as those convictions which are based on dishonesty or some other lack of integrity." (16 Cal.3d at p. 222.) "Not as heavily" does not, of course, mean "not at all."

There is then some basis—however tenuous—for inferring that a person who has committed a crime which involves moral turpitude other than dishonesty is more likely to be dishonest than a witness about whom no such thing is known.[9] Certainly the inference is not so irrational that it is beyond the power of the people to decree that in a proper case the jury must be permitted to draw it, if it wishes, and the "no limitation" language of subdivision (f) makes it abundantly clear that the people so decreed.[10]

---

[9]Compare the definition of "relevance" in rule 401 of the Federal Rules of Evidence (28 U.S.C.): "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have been without the evidence."

[10]This was evidently also the view of the 1965 Legislature which enacted the Evidence Code. Section 788 as submitted by the Law Revision Commission would have restricted felony-impeachment to felonies with respect to which "an essential element . . . is dishonesty or false statement." (7 Cal. Law Revision Com. Rep. p. 142.) The commission commented: "Subdivision (a) modifies existing law, for under existing law any felony conviction may be used for impeachment purposes even though the crime involved has no bearing on the witness' honesty or veracity. See Code Civ. Proc., § 2051. Section 788 substitutes for this undiscriminating treatment of felony convictions the requirement that the convictions be relevant to the purpose for which they are admitted, *i.e.,* that the convictions tend to prove the witness' dishonesty or lack of veracity. [¶] 'Dishonesty' as used in Section 788 means 'any breach of honesty or trust, as lying, deceiving, cheating, stealing, or defrauding.' Merriam-Webster, New International Dictionary (3d ed. 1961). '[T]he measure of [the] meaning [of dishonesty] is . . . an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest in the common speech of men.' Cardozo, C.J., in *World Exchange Bank v. Commercial Casualty Ins. Co.,* 255 N.Y. 1, 173 N.E. 902, 903 (1930). Thus, convictions of felonies involving fraud, deception, and lying may, of course, be shown under Section 788. *Cf. Hogg v. Real Estate Commissioner,* 54 Cal.App.2d 712, 129 P.2d 709 (1942). All forms of larceny may also be shown. *Cf. Brecheen v. Riley,* 187 Cal. 121,

There is, of course, a practical problem: since, as we have seen (*Barnes v. United States, supra,* 412 U.S. 837; *Bruton* v. *United States, supra,* 391 U.S. 123) the constitutional imperative of relevance prohibits impeachment with felonies which do not connote moral laxity of any kind, it will be necessary to determine with respect to each felony conviction offered for impeachment—difficult though this may prove to be—whether it does or does not involve moral turpitude.[11] If it does not, that is the end of it. If it does, it is prima facie admissible, subject to the exercise of trial court discretion. Naturally, the more tenuous the court finds the connection between the moral defect shown by the conviction and the only defect directly relevant—dishonesty—the more likely it is to disallow impeachment.

B

The next problem is familiar to us from other contexts. (See *People* v. *Crowson* (1983) 33 Cal.3d 623, 633-635 [190 Cal.Rptr. 165, 660 P.2d 389]; *In re Finley* (1968) 68 Cal.2d 389, 392-393 [66 Cal.Rptr. 733, 438 P.2d 381].) ■ In order to determine the presence of moral turpitude, does the trial court look only to the elements of the offense of which the witness was previously convicted, or may it go behind the fact of the conviction and receive evidence on the underlying facts? To decide this issue, we must return to basics.

Wigmore points out that the reasons of auxiliary policy—avoidance of unfair surprise and confusion of issues—which generally prohibit impeachment of a witness with extrinsic proof of particular acts of misconduct, do not apply where the misconduct has ripened into a conviction. (3A Wigmore, Evidence (Chadbourn rev. ed. 1970) §§ 879, 880.) A witness ought to know what convictions he has suffered and their proof should not entail

---

200 Pac. 1042 (1921). Similarly, other crimes involving the wrongful deprivation of another of his property and furtive, stealthy crimes (such as burglary) may be shown. [¶] On the other hand, such crimes as felony drunk driving, manslaughter, arson (except for fraudulent purposes), assault, and possession of a deadly weapon do not involve dishonesty or false statement and may not be shown under Section 788." The draft did not find favor, and section 788 became one of the few sections which were amended by the Legislature. (See *People* v. *House, supra,* 12 Cal.App.3d 756, 771, fn. 8 (conc. opn.).)

[11]Permitting impeachment with crimes involving moral turpitude is not a new concept, though administratively it has proved awkward. It was adopted by Connecticut in *Drazen* v. *New Haven Taxicab Co.* (1920) 95 Conn. 500 [111 A. 861, 863-864], but abandoned 45 years later in *Heating Acceptance Corporation* v. *Patterson* (1965) 152 Conn. 467 [208 A.2d 341, 343-344].

Some of the problems may be ameliorated by the fact that, in connection with other statutes, considerable bodies of law concerning the characterization of felonies as involving or not involving moral turpitude have developed. (See for example, 1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, § 195; Annot., What Constitutes "Crime Involving Moral Turpitude" Within Meaning of §§ 212(a)(9) and 241(a)(4) of Immigration and Nationality Act (8 USCS §§ 1182(a)(9), 1251(a)(4)), and Similar Predecessor Statutes Providing for Exclusion or Deportation of Aliens Convicted of Such Crime (1975) 23 A.L.R.Fed. 480.)

complicated factual questions. Obviously, however, if the conviction is only admissible if it evinces moral turpitude and such turpitude can only be established through extrinsic evidence, confusion of issues becomes inevitable and unfair surprise more than probable. Therefore, as in the *Finley-Crowson* line of cases, a witness' prior conviction should only be admissible for impeachment if the least adjudicated elements of the conviction necessarily involve moral turpitude. We reemphasize that even such admissibility is subject to trial court discretion under section 352.

## III

■ Defendant also challenges subdivision (f) on due process and equal protection grounds. The due process challenge proceeds on the assumption that the subdivision will be interpreted to deprive the court of discretion to prevent impeachment with irrelevant convictions. Since we have held that the court has discretion even with respect to relevant priors, the point falls away.

The equal protection challenge is based on the premise that the Constitution demands that the rules of evidence in criminal cases be the same as those which apply in civil litigation. No authority for such a proposition is cited and we know of none.[12] In any event, as we have interpreted subdivision (f) the differences between civil and criminal cases are nonexistent. Finally, even if there is an equal protection problem, it is not explained why subdivision (f)—part of the California Constitution—should take a backseat to the Evidence Code.

## IV

■ Applying these precepts to the facts of this case, we hold that while simple possession of heroin does not necessarily involve moral turpitude (see *In re Higbie* (1972) 6 Cal.3d 562, 572 [99 Cal.Rptr. 865, 493 P.2d 97] and *In re Fahey* (1973) 8 Cal.3d 842, 849-850 [106 Cal.Rptr. 313, 505 P.2d 1369, 63 A.L.R.3d 465]), possession for sale does—though the trait involved is not dishonesty but, rather, the intent to corrupt others.[13] Defendant should, therefore, not have been impeached with the conviction for simple possession at all, and the trial court erred in stating it had no discretion with respect to either conviction.

---

[12]If defendant is correct, would it follow that the exclusionary rule is applicable in civil cases and that the right to confront witnesses affects the hearsay rule even in such litigation?

[13]We note that possession of heroin for sale was the precise felony involved in *People* v. *Spearman, supra*, 25 Cal.3d 107. The inquiry there was whether the crime involved dishonesty. The majority's answer was in the negative. The question here is, of course, somewhat broader: does possession of heroin for sale necessarily evince any character trait which can reasonably be characterized as "immoral."

Were the errors prejudicial? The People's case was strong: On June 14, 1982, silverware and other items, including two white pillowcases, were taken in a residential burglary. On June 18, 1982, defendant's son, Richard, and his passenger, Gabriel, were stopped for a traffic violation. The officer saw a pillowcase under the driver's seat and, with Richard's consent, inspected the contents and found silver items wrapped in newspaper. The young men told the officer that the silver belonged to defendant. The three went to defendant's home where, in response to the officer's inquiries, defendant stated that she owned silverware, that she did not know that her son had it, and that it was missing from the place where she kept it. She described her silverware as a tea service, spoons and forks, wrapped in newspaper and contained in a pillowcase. When the officer brought the pillowcase and its contents into the house, defendant identified the silverware as hers. The items were subsequently identified as those stolen in the residential burglary of June 14.

As her first witness and over the People's vigorous objection, defendant called William Huth, her parole officer. Huth testified that at defendant's parole revocation hearing both Richard and Gabriel had testified that the silver belonged to Gabriel, that Gabriel tried to sell the silver to Richard, and that he did not inform Richard that the silver was stolen until after the police stopped Richard's car. A defense investigator testified that Richard's girlfriend told him that she had asked defendant to admit the silver was hers to protect Richard.

Defendant testified that she had identified the silver as hers because she did not have her glasses on and could not see well; she did own some silver, but it was packed away and, when the police were at her home, she did not feel like looking for it; she thought her son had taken the silver to pawn it, not to steal it. Defendant produced her "silver" at trial. It was pewter and stainless steel. On cross-examination, defendant testified that she had had more silver but it was stolen when she was incarcerated in CRC. She stated she had been in CRC and CIW and she admitted the two 1981 priors for possession of heroin and possession of heroin for sale. The jury was instructed to consider the priors only for the purpose of determining the credibility of the witness.

The defense, of necessity, had to explain defendant's admissions regarding the silver. The defense also had valuable evidence which served to exculpate defendant although, unfortunately for defendant, it consisted of testimony that others had given at her parole revocation hearing. Thus, well before the prosecution disclosed the priors for impeachment purposes, the jury knew that defendant had a criminal past. Defendant herself volunteered that she had been incarcerated at CRC and the woman's prison before any

attempt was made to impeach her with the priors. As the Attorney General points out, identifying the nature of the prior felonies may well have operated to lessen the prejudice in their introduction, for the jury otherwise was free to speculate why defendant was on parole. (See *People* v. *Rollo, supra,* 20 Cal.3d at p. 119.) Further, the instructions restricting the use of priors for impeachment only may have prevented the jury from giving unwarranted significance to defendant's parole status on the question of her guilt.

After a review of the entire record we are of the opinion that it is not reasonably probable that a result more favorable to defendant would have occurred in the absence of error. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Affirmed.

Mosk, J., and Broussard, J., concurred.

**GRODIN, J.,** Concurring and Dissenting.—With all respect, I find the majority's reading of subdivision (f) unpersuasive. As the majority concede (*ante,* p. 310), the language of subdivision (f) does not on its face suffer from any lack of clarity or directness. Indeed, if the electorate wished to assure categorically that any prior felony conviction of any person in any criminal proceeding is to be used for purposes of impeachment or enhancement of sentence in any criminal proceeding "without limitation," it is difficult to conceive how they could have found better language, appropriate for a Constitution, to express that purpose.

My colleagues, however, find a conflict between the unequivocal language of subdivision (f) and that portion of subdivision (d) which refers to Evidence Code section 352, and on the basis of accommodation to that asserted conflict, they conclude that the electorate had a much narrower intent. According to this view, the phrase "without limitation" refers only to "the rigid, black letter rules of exclusion which we had grafted onto the [Evidence] [C]ode by the *Antick* [15 Cal.3d 79 (123 Cal.Rptr. 475, 539 P.2d 43)] line of decisions" (*ante,* p. 312), and in no way precludes trial courts from excluding evidence of a prior conviction on the basis that its relevance is outweighed by its potential prejudice.

I find the majority's argument unpersuasive for several related reasons. First, any inconsistency between subdivisions (f) and (d) would be subject to the statutory rule of construction that "when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent will control a general one that is inconsistent with it." (Code Civ. Proc., § 1859.) This rule, like other canons of statutory construction,

applies to initiative measures and constitutional provisions as well as statutes, since it is directed to ascertaining and implementing the intent of the body which adopted the measure under consideration. (*Winchester* v. *Mabury* (1898) 122 Cal. 522, 527 [55 P. 393]; *Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658 [194 Cal.Rptr. 781, 669 P.2d 17]; *Perry* v. *Jordan* (1949) 34 Cal.2d 87, 93 [207 P.2d 47].) Subdivision (f) is here the specific provision, evidencing a clear and unambiguous intent that there be no limitation upon the admissibility of certain evidence. That intent should be given effect over the more general policies reflected in subdivision (d).

Second, any inconsistency between the two subdivisions can readily be avoided by reading the word "section" in subdivision (d) to mean "subdivision." As the majority recognize, the drafters of Proposition 8 used the word "section" at other times when they must have meant "subdivision," just as they used the word "subdivision" at times when they meant "section." It seems quite apparent that is what happened here. The savings clause in subdivision (d) must be read in the context in which it appears. It is, in its totality, a qualification of the general proposition in subdivision (d) that "relevant evidence shall not be excluded in any criminal proceeding . . . ." The other cited provisions of the Evidence Code (§§ 782 & 1103) and the other rules of evidence to which the savings clause refers ("any existing statutory rule of evidence relating to privilege or hearsay") have bearing only upon that proposition. It thus seems to me far more plausible to read the savings clause as a limitation upon subdivision (d) only, than to read one part of it as a qualification to the otherwise absolute language of subdivision (f).

Finally, reading the section 352 reference in subdivision (d) as a qualification of the "without limitation" language in subdivision (f) leaves the latter with a meaning which I doubt the electorate intended. Trial courts will be free to exclude evidence of prior convictions without appellate review. On the other hand, if a trial court decides to admit such evidence, I assume that its decision will remain reviewable on appeal by the defendant from any conviction, since "no discretion is so unbounded that it cannot be abused" (*ante*, p. 307). And, I assume that the trial court in exercising its discretion, and the appellate court in reviewing its exercise, are both to be guided by the four factors enunciated in *Beagle* [6 Cal.3d 441 (99 Cal.Rptr. 313, 492 P.2d 1)]. (*Ante*, p. 307.) It thus seems inevitable that in some cases appellate courts will reverse trial courts for admitting evidence of a prior conviction for failure properly to weigh and consider those factors. The line between doing that and "delineating the boundaries of permissible discretion" (*ante*, p. 307) is subtle indeed.

In *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1] this court confronted the relationship between Evidence Code sections 352

and 788. The latter section provides in part that "[f]or the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony . . . ." Relying upon the permissive word "may" rather than a mandatory word such as "shall," we concluded that "the choice of language leaves the trial court with discretion to exclude proof of prior felony convictions offered in impeachment." (6 Cal.3d at p. 452.) We found support for that construction in a decision of the United States Court of Appeals for the District of Columbia, *Luck* v. *United States* (D.C.Cir. 1965) 348 F.2d 763, 767-768, which construed language in a similar statute to the same effect.

After the decision in *Luck, supra,* Congress amended the applicable statute to provide that the prior convictions of a witness, with certain specified exceptions, "shall be admitted if offered." (Act of July 29, 1970, Pub.L. No. 91-358, 84 Stat. 473.)[1] The District of Columbia Court of Appeals subsequently held that Congress, by the new language, had overruled the *Luck* doctrine, and that trial courts no longer had discretion to limit or prohibit impeachment of witnesses with their prior convictions. (*Taylor* v. *United States* (D.C. 1971) 280 A.2d 79, 81.) Whether we like it or not, it seems to me that Proposition 8 was intended to have similar effect in this state.

I will deal briefly with the constitutional issue posed by my interpretation. A good argument can be made—indeed, has been made by the State Public Defender as amicus curiae—that unlimited use of prior convictions may deprive a defendant of his federal constitutional right to due process of law. This argument is based, principally, upon language in *Spencer* v. *Texas* (1967) 385 U.S. 554, 561 [17 L.Ed.2d 606, 612, 87 S.Ct. 648], to the effect that when a criminal defendant's prior convictions are introduced for one of several accepted purposes, his interests are protected both by limiting instructions and by "the discretion residing with the trial judge to limit or forbid the admission of particularly prejudicial evidence even though admissible under an accepted rule of evidence." Remove that discretion, amicus argues, and you have removed a constitutionally essential condition to introduction of prior convictions in evidence.

---

[1] The new statute, which is set forth in an appendix to the court's opinion in *Dixon* v. *United States* (D.C. 1972) 287 A.2d 89, certiorari denied, 407 U.S. 926 [32 L.Ed.2d 813, 92 S.Ct. 2474], provided for admission into evidence of any criminal offense which "(A) was punishable by death or imprisonment in excess of one year under the law under which [the defendant] was convicted, or (B) involved dishonesty or false statement (regardless of punishment). . . ." (*Id.,* at p. 100.) Exceptions were made for a conviction more than 10 years old, and convictions which had been the subject of pardon, annulment, or certificate of rehabilitation.

This argument was considered and rejected, however, by the very court which decided *Luck,* after Congress reversed that decision by statute, and the United States Supreme Court denied certiorari. (*Dixon* v. *United States, supra,* 287 A.2d 89, 92-96.) Subsequently, the United States Court of Appeals for the District of Columbia Circuit, sitting en banc, reached the same conclusion in an opinion written by Judge McGowan, who had been the author of *Luck.* (*United States* v. *Belt* (D.C.Cir. 1975) 514 F.2d 837.) Judge McGowan's opinion observed that the unsuccessful petition for certiorari in *Dixon* "emphasized strongly the significance of the language about judicial discretion" in *Spencer,* and that "*Dixon* was a case which on its facts raised a very serious question indeed about prejudicial effect." (*Id.,* at p. 848, fn. 18.) "What *Spencer* does appear to contemplate," the opinion concluded, "is that a legislature may, without impingement upon the Constitution, conclude that the public interest in getting before the jury this evidence bearing upon the credibility of the defendant-witness outweighs its inescapably prejudicial effect. A belief that such constitutional latitude exists is reflected in the fact that [in] many states, as in a few federal circuits . . ., the admissibility of prior convictions for impeachment purposes is treated as a mandatory matter." (*Id.,* at p. 849.) In light of this history, it seems quite clear that the argument of *amicus* will not fly.

I agree with the majority, however, that evidence so potentially prejudicial must at least meet a threshold constitutional standard of "relevance," and in the absence of legislative guidance I accept the "moral turpitude" test which the majority proposes. I suspect, though, that both the moral turpitude test and the standards by which appellate courts are to review the exercise of that discretion which the majority concludes trial courts retain will give rise to difficult problems of judicial administration; and I suggest that the optimum solution may lie in action by the Legislature enumerating or defining the offenses which it believes to have sufficient relevance to veracity to be admissible for purposes of impeachment.

I agree with the majority that admission into evidence of the conviction for possession of heroin was harmless error, and so concur in the result.

**LUCAS, J.**—I concur in the judgment affirming defendant's conviction. I dissent, however, to the majority's analysis in two major respects.

First, for the reasons set forth in the concurring and dissenting opinion of Justice Grodin, I am convinced that new article I, section 28, subdivision (f), of the state Constitution was intended to abrogate *all* judicially created restrictions upon the admissibility of prior felony convictions, and to preclude the exercise of discretion to exclude certain prior convictions pursuant to section 352 of the Evidence Code. Both the language of the new provision

and the history leading up to its enactment by the voters conclusively demonstrate the flaws in the majority's contrary position.

Second (and unlike Justice Grodin), I cannot join in the majority's creation of a "moral turpitude" exception to the general rule of admissibility. Section 28, subdivision (f), means what it says: "*Any* prior felony conviction . . . shall subsequently be used *without limitation* for purposes of impeachment or enhancement of sentence . . . ." (Italics added.) *Any* prior felony conviction shall be used, not only those convictions which some court may characterize as morally reprehensible. True, there may exist some *federal* due process restriction upon the kinds of prior convictions deemed relevant for impeachment purposes. I am unaware of any such restrictions, however, and the majority cites no cases imposing any. Rather than burden our trial courts with the confusing and uncertain "moral turpitude" standard,[1] I would, in the absence of any restrictions imposed by the federal courts, allow admission of *all* prior felonies on the theory that the commission of a felony offense necessarily bears on one's credibility regardless of the nature of that offense.

**BIRD, C. J.,** Concurring and Dissenting.—■■■ I concur in the majority's holding that trial courts retain discretion under Evidence Code section 352 to exclude evidence of prior felony convictions when their probative value is outweighed by the risk of undue prejudice. I also agree that the suggested factors set forth in *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1] (see *ante,* at p. 307) should continue to guide the trial courts in their exercise of that discretion. However, I cannot join the majority's conclusion that moral turpitude is a proper or a workable standard for determining the admissibility of prior felony convictions.

I.

Prior felony convictions are admissible to impeach a witness if they are relevant to a witness's credibility. Justice Work's persuasive opinion for a unanimous court in *People* v. *Hoffman* (Cal.App.) is herewith adopted as my own:*

[U]nder the Constitution and laws of California, only those prior felony convictions relevant to [[a]] witness's credibility may be used to impeach testimonial credibility.

---

[1] As Justice Tobriner once observed, "Terms such as 'immoral or unprofessional conduct' or 'moral turpitude' stretch over so wide a range that they embrace an unlimited area of conduct." (*Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 224-225 [82 Cal.Rptr. 175, 461 P.2d 375].)

*Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; double brackets enclosing material are used to denote additions. (See *Conservatorship of Early* (1983) 35 Cal.3d 244, 247 [197 Cal.Rptr. 539, 673 P.2d 209].)

Relevancy is the engine of the judicial search for truth. As Thayer stated: "There is a principle—not so much a rule of evidence as a presupposition involved in the very conception of a rational system of evidence . . . which forbids receiving anything irrelevant, not logically probative. . . ." (Thayer, Preliminary Treatise on Evidence (1898) p. 264, quoted in McCormick on Evidence (2d ed. 1972) p. 433.) Wigmore states this basic axiom of evidence indirectly affects "the rules directed to prevent the jury from substituting passion and prejudice, instead of reasoning, as the foundation of its conclusion and the doctrine that even the legislature cannot establish a rule of decision that will deprive the judiciary of its power to investigate the facts by rational methods." (1 Wigmore, Evidence (Tillers rev. ed. 1983) § 9, p. 665.)

In California, Evidence Code[2] sections 210 and 350 [[set forth]] these principles. Section 210 states: " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Section 350 provides: "No evidence is admissible except relevant evidence." The impeaching relevance of prior felony convictions has most recently been controlled by section 788[3] as construed by *Beagle* and its progeny. (*People* v. *Barrick* (1982) 33 Cal.3d 115 [187 Cal.Rptr. 716, 654 P.2d 1243]; *People* v. *Spearman* (1979) 25 Cal.3d 107 [157 Cal.Rptr. 883, 599 P.2d 74]; *People* v. *Fries* (1979) 24 Cal.3d 222 [155 Cal.Rptr. 194, 594 P.2d 19]; *People* v. *Woodard* (1979) 23 Cal.3d 329 [152 Cal.Rptr. 536, 590 P.2d 391]; *People* v. *Rollo* (1977) 20 Cal.3d 109 [141 Cal.Rptr. 177, 569 P.2d 771]; *People* v. *Rist* (1976) 16 Cal.3d 211 [127 Cal.Rptr. 457, 545 P.2d 833]; *People* v. *Antick* (1975) 15 Cal.3d 79 [123 Cal.Rptr. 475, 539 P.2d 43].)

While *Beagle* affirms the trial court's discretion to weigh the probative value of prior felonies against potential prejudice to the defendant (§ 352),

---

[2]All statutory references are to the Evidence Code unless otherwise specified.

[3]Section 788 states: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony unless:

"(a) A pardon based on his innocence has been granted to the witness by the jurisdiction in which he was convicted.

"(b) A certificate of rehabilitation and pardon has been granted to the witness under the provisions of Chapter 3.5 (commencing with Section 4852.01) of Title 6 of Part 3 of the Penal Code.

"(c) The accusatory pleading against the witness has been dismissed under the provisions of Penal Code Section 1203.4, but this exception does not apply to any criminal trial where the witness is being prosecuted for a subsequent offense.

"(d) The conviction was under the laws of another jurisdiction and the witness has been relieved of the penalties and disabilities arising from the conviction pursuant to a procedure substantially equivalent to that referred to in subdivision (b) or (c)."

the threshold question to this balancing and the fundamental issue in all challenges to admissibility is whether the proffered evidence is probative of the issue to be resolved. The Legislature has established the *sole trait* relevant to impeaching credibility is truthfulness; that is, "[e]vidence of traits of his character other than honesty or veracity, or their opposites, is inadmissible to attack or support the credibility of a witness." (§ 786.) "Since section 788 authorizes the use of [prior felony convictions] only '[f]or the purpose of attacking the credibility of a witness,' the first factor which the trial court must evaluate is whether the prior felony conviction reflects adversely upon credibility. Although the commission of any felony is sometimes said to reflect upon the *character* of the individual convicted, such a belief would not justify the use of every type of felony conviction to impeach *credibility*. 'Character is only an abstract group-term; what actually exists is a number of virtually *separate traits*, e.g., honesty, violence, benevolence, etc.' (Wigmore, Science of Judicial Proof (1937) p. 106; original italics.)" (*People* v. *Woodard, supra,* 23 Cal.3d 329, 335.)

In defining the limits of relevance for impeachment, our Supreme Court has examined the *elements* of the prior offense. " 'Only a conviction which has as a necessary element an intent to deceive, defraud, lie, steal, etc., impacts on the credibility of a witness.' [Citation.] It is not sufficient that the prior offense shows a 'disrespect for law' or a 'character trait of willingness to do anything.' [Citation.]" (*People* v. *Barrick, supra,* 33 Cal.3d 115, 123-124.) Thus, the nature of the act, and *not* the nature of the actor, is the dimension on which the court has scaled the probative value of prior felony convictions.

Violent or assaultive crimes have little or no bearing on one's honesty or veracity. (*People* v. *Beagle, supra,* 6 Cal.3d 441, 453.) In *People* v. *Rist, supra,* 16 Cal.3d 211, the Supreme Court expressly disapproved the holding in *People* v. *Delgado* (1973) 32 Cal.App.3d 242 [108 Cal.Rptr. 399], which held prior convictions for assault with intent to rape and attempted forcible rape involved elements of "stealth" and bore "some rational relationship to dishonesty." (*Id.,* at p. 250.) The Court of Appeal in *People* v. *Nelson* (1976) 63 Cal.App.3d 11 [133 Cal.Rptr. 552], determined prior rape convictions were irrelevant to credibility. (*Id.,* at p. 22.) []

The People argue article I, section 28, subdivision (f) of the state Constitution prohibits us from reaching this conclusion. To the contrary, our holding does violence neither to the intent nor construction of this section. We briefly review the evolution of impeachment by prior conviction.

At common law in the 17th century, a person convicted of an "infamous" crime was incompetent to be a witness. (2 Wigmore, Evidence (Chadbourn

rev. ed. 1979) §§ 519-520, pp. 725-730.) Though difficult to specify, the usual and more broadly accepted infamous crimes included treason, felonies, and crimes involving falsehood. Such exclusions worked a further punishment for infamy and precluded the presumedly untrustworthy from presenting unreliable evidence. The rationale underlying the latter consequence was supported by a common belief of the times: Since "all treasons, and almost all felonies, were punishable with death, it was very natural that crimes, deemed of so grave a character as to render the offender unworthy to live, should be considered as rendering him unworthy of belief in a court of justice. [Fn. omitted.]" (1 Greenleaf, Evidence (16th ed. 1899) § 373, p. 514, quoted in Note, *Constitutional Problems Inherent in the Admissibility of Prior Record Conviction Evidence for the Purpose of Impeaching the Credibility of the Defendant Witness* (1968) 37 U.Cin.L.Rev. 168, 169.) "Nevertheless, in whatever degree the disqualification may have been thought of as a part of the punishment of the offender himself, it was obvious that this theory could not of itself justify the incidental punishment of innocent persons who might need the convict's testimony; and hence the justification had ultimately to be founded on some more acceptable reason. Hence, as soon as the rule begins to be reasoned about, we find it placed upon the more plausible theory of *actual moral turpitude,* i.e., the person is to be excluded because from such a moral nature it is useless to expect the truth . . . ." (2 Wigmore, *op. cit. supra,* at p. 726.) However, even this rationale was roundly criticized, and by the 19th century, exclusion of infamous criminals as witnesses was all but abolished from Anglo-American law in favor of decisional and statutory modifications allowing the infamous criminal to testify while permitting the conviction to be entered into evidence to affect the weight of his testimony. Typical of these changes was a New York statute which provided: "A person who has been convicted of a crime is a competent witness; but the conviction may be proved, for the purpose of affecting the weight of his testimony . . . ." (N.Y. Civ. Prac. Law, § 4513 (McKinney 1963).)

The modern evolution of these impeachment principles has resulted in considerable diversity in state practice. Nonetheless, the relevance of the prior conviction to credibility remains the primary, and in some jurisdictions exclusive, factor in admitting proffered impeachment evidence. (See 81 Am.Jur.2d, Witnesses, §§ 569-572, pp. 574-578; Annot. (1920) 6 A.L.R. 1608, supplemented by (1923) 25 A.L.R. 339, (1936) 103 A.L.R. 350, and (1946) 161 A.L.R. 233; 3A Wigmore, Evidence (Chadbourn rev. ed. 1970) § 987, fn. 1, pp. 862-911 and § 987 (1984 pocket supp.) pp. 22-38; Note, *Other Crimes Evidence at Trial: Of Balancing and Other Matters* (1961) 70 Yale L.J. 763, 774-778.)

As mentioned, relevance is the threshold test for the admission of prior felony convictions for impeachment. Whether relevance has been aban-

doned as a criterion under article I, section 28, subdivision (f) of the California Constitution depends on a proper construction of that section.

Section 28, subdivision (f) was added to the California Constitution in June 1982 with the passage of the Proposition 8 initiative. Under its terms, "[a]ny prior felony conviction . . . shall subsequently be used without limitation for purposes of impeachment . . . ." The People argue the prior felony convictions are free from *any* restraint on their admission for impeachment. However, a constitutional amendment must be plainly and naturally construed, relying on the ordinary and accepted meaning of its words. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) And such a construction must reach *all* the words. Thus, while the words "without limitation" undoubtedly unshackle some admissibility restraints, they do not eliminate the fact that the prior felonies are still being admitted "for purposes of impeachment." Since 1965, section 780 has stated the general rule regarding impeachment: "[T]he court or jury may consider in determining the credibility of a witness *any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony . . . .*"[4] (Italics added.) As can be seen, section 780 embodies the fundamental concept of relevance appearing in section 210. Further, section 786 explicitly refines the potential use of character evidence for impeachment by stating: "Evidence of traits of his character other than honesty or veracity, or their opposites, is inadmissible to attack or support the credibility of a witness." Thus, a plain reading of subdivision (f) in light of the long-accepted meaning of its words under the laws of California does not preclude the assessment of relevance in determining prior conviction evidence for impeachment.

A contrary interpretation proves too much. Any rational theory of impeachment by a prior felony conviction requires two inferential steps. First, the trier of fact must link the commission of the felony, i.e., conduct, to some propensity in the witness to lie, i.e., a character trait. From this propensity, the fact finder may then infer the witness is dishonest or untruthful. In the most obvious example, the fact finder hears evidence of the witness's past conduct of making false statements under oath from which he can infer the witness has a character trait for untruthfulness, from which he may further infer the present testimony is likely incredible.

The People's argument circumvents or totally eliminates the second inferential step. They argue the *commission* of any felony is itself probative

---

[4]The standard dictionary definition of "impeach" also comports with the language of section 780. Illustrative is the entry in Webster's New World Dictionary (2d college ed. 1982) at page 703: "1. to challenge or discredit . . . 2. to *challenge* the practices or *honesty* of . . . ." (Italics added.)

of credibility. Stated most simply, they maintain all former felons will lie under oath. But this conclusion is betrayed by the flaw in its underlying premise. Conduct is the manifestation of many human motivations, and not an unerring reflection of character. Indeed, the line from one's prior conduct to one's present truthfulness is rarely straightly drawn.[5] For example, one homicide may be a product of a premeditated and stealthily crafted scheme, effectuated by misrepresentations and false statements; another may be a spontaneous response to a foul and sinister provocation. While a conviction for either homicide would be a felony, it would be illogical to maintain each equally proves the witness's present truthfulness. To argue otherwise is to support a belief common in the 17th century which considers neither modern advances in jurisprudence nor in psychology. Further, the offer of past felonious conduct in this example may support other inferences regarding the witness's character, inferences not at issue in testing one's credibility. For instance, a jury might infer a fortiori that both felons have a propensity for violence. Mindful of the potential prejudice in such evidence, the Legislature provided: "[E]vidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness." (§ 787.) Thus, the second inferential step cannot logically, nor legally, be excluded. It functions much like a filter, sifting the witness's conduct to exclude logically irrelevant, and thereby potentially prejudicial, character evidence and to include assuredly relevant conduct demonstrating a propensity for truthfulness and honesty or the lack thereof. As Justice Jefferson states: "If the trait involved in the offense is that of dishonesty or untruthfulness, a felony conviction of such an offense has far greater probative value to impeach a witness than if the character trait is other than that of dishonesty or untruthfulness." (2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) Witnesses, § 28.8, p. 924.) Our Supreme Court assures such high probative value by requiring that "[u]nless the conviction contains an element reflecting on defendant's honesty, it may not be admitted." (*People* v. *Barrick, supra,* 33 Cal.3d 115, 123.)

The People, however, argue the framers of subdivision (f) intended to free impeaching prior conviction evidence from a relevancy requirement. To effectuate the purpose of a law, the court must construe its provisions consistent with the intent of the lawmakers. (*Sand* v. *Superior Court* (1983) 34 Cal.3d 567, 570 [194 Cal.Rptr. 480, 668 P.2d 787].) This fundamental principle of statutory construction applies with equal force to constitutional

---

[5]As Wigmore eloquently states: "From the point of view of modern psychology, the moral disposition which tends for or against falsehood is an elusive quality. Its intermittent operation in connection with other tendencies, and the difficulty of ascertaining its quality and force, make it by no means a feature peculiarly reliable in the diagnosis of testimonial credit." (3A Wigmore, Evidence (Chadbourn rev. ed. 1970) § 922, p. 725, fn. omitted.)

amendments adopted by the initiative process. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 245.) "In construing an initiative measure, the California courts have often referred to the analysis and arguments in the voters' pamphlet as an aid to ascertaining the intention of the framers and the electorate. [Citations.]" (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 143 [197 Cal.Rptr. 79, 672 P.2d 862], fn. omitted.)

The analysis of subdivision (f) by the Legislative Analyst states: "Prior Convictions. The measure would amend the State Constitution to require that information about prior felony convictions be used without limitation to discredit the testimony of a witness, including that of a defendant. Under current law, such information may be used only under limited circumstances." (Ballot Pamp., Proposed Amends. to Cal. Const., with analysis by the Legislative Analyst, Primary Elec. (June 8, 1982) p. 54.) [] [R]elevancy is neither specifically excluded by, nor incompatible with, the amendment's analysis. Prior felony convictions are to be used to discredit the *testimony* of the witness, not to discredit the general *character* of the witness. Proof the witness is a "bad guy" is not evidence that he will lie under oath. Thus, the intended focus of impeachment is the credibility of the witness. The most logically consistent, assuredly accurate, and procedurally expedient way to challenge witness credibility is to present evidence discrediting the witness's truthfulness. Felony convictions unrelated to truthfulness can support only irrelevant inferences and cannot further the stated purpose revealed in the voters' pamphlet analysis.

Intent, however, can be best ascertained from the language of the constitutional amendment. (*People* v. *Black* (1982) 32 Cal.3d 1, 5 [184 Cal.Rptr. 454, 648 P.2d 104].) Courts must construe all provisions of a statute together, giving significance to every part in pursuance of the intended purpose. (*Turner* v. *Board of Trustees* (1976) 16 Cal.3d 818, 826 [129 Cal.Rptr. 443, 548 P.2d 1115].) In scrutinizing article I, section 28 in its entirety, we find the preamble, subdivision (a), promotes "a bill of rights for victims of crime" through "broad reforms in the procedural treatment of accused persons and the disposition and sentencing of convicted persons . . . ." This subdivision does not suggest these goals are to be effected through unrestrained admission of irrelevant and misleading prior conviction evidence. Subdivision (d), however, does specifically provide for a "right to truth-in-evidence." It is highly significant that in ensuring this right, subdivision (d) provides, "*relevant* evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court." (Italics added.) Harmonizing subdivisions (d) and (f), as we must, we find it highly improbable an elec-

torate seeking truth-in-evidence would require such evidence be relevant to the disputed issue, but in seeking the reform of impeachment, would find relevance to be unwanted or undesirable. An harmonious construction of the specific language of section 28 supports the survival of relevancy as a prerequisite to admitting prior felony convictions for impeachment.

This construction also finds support in other state courts construing similar impeachment laws.[6] In *People* v. *Montgomery* (1971) 47 Ill.2d 510 [268 N.E.2d 695, 67 A.L.R.3d 816] the Illinois Supreme Court interpreted a statute stating: " 'No person shall be disqualified as a witness in any criminal case or proceeding . . . by reason of his having been convicted of any crime; but such . . . conviction *may* be shown for the purpose of affecting his credibility . . . .' " (*Id.*, at p. 697; Ill. Rev. Stat., ch. 38, par. 155-1 (1967).) Although the prosecution argued the trial court had no discretion to exclude a 20-year-old robbery conviction, the court determined relevance was fundamental to the admission of evidence and cited Wigmore for the proposition, " '[n]one but facts having rational probative value are admissible.' " (*People* v. *Montgomery, supra,* at p. 697.) Similarly, the New Hampshire Supreme Court determined the trial court should exercise its discretionary powers and "should bear in mind that the use of prior convictions to show nothing more than a disposition to commit crime, or the crime currently charged, would violate the Due Process Clause of the Fourteenth Amendment" (*State* v. *Cote* (1967) 108 N.H. 290 [235 A.2d 111, 116], cert. den. *Cote* v. *New Hampshire* (1968) 390 U.S. 1025 [20 L.Ed.2d 282, 88 S.Ct. 1412]), even though the controlling statute provided: " 'No person shall be incompetent to testify on account of his having been convicted of an infamous crime, but the record of such conviction may be used to affect his credit as a witness.' " (*Id.*, at p. 115.) Even in *State* v. *Driscoll* (1972) 53 Wis.2d 699 [193 N.W.2d 851, 50 A.L.R.3d 554], a case cited for allowing impeachment by convictions not confined "to crimes having a relationship to the honesty or veracity of the witness" (81 Am.Jur.2d, Witnesses, § 571, p. 578), the Wisconsin Supreme Court mandated the balancing of relevancy against prejudice in admitting prior felony convictions for impeachment. (*State* v. *Driscoll, supra,* at pp. 857-858.)

Finally, we interpret subdivision (f) as we do to avoid conflict with the due process clause of the Fourteenth Amendment. Established principles of

---

[6]The Federal Rules of Evidence *expressly* incorporate relevancy as a threshold test in admitting prior convictions to impeach. Rule 609(a) [(28 U.S.C.)] provides: "For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment."

judicial construction require California courts to adopt "an interpretation of a statutory provision which, 'consistent with the statutory language and purpose, eliminates doubt as to the provision's constitutionality' [citation]." (*People* v. *Amor* (1974) 12 Cal.3d 20, 30 [114 Cal.Rptr. 765, 523 P.2d 1173].) In the present case, an interpretation of subdivision (f) allowing the unfettered admission of prior felony convictions for impeachment creates a significant constitutional problem.

Due process assures a criminal defendant a fundamentally fair trial. (*Lisenba* v. *California* (1941) 314 U.S. 219, 236 [86 L.Ed. 166, 179-180, 62 S.Ct. 280].) The control of evidence is central to this fairness. (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 206 [4 L.Ed.2d 242, 247-248, 80 S.Ct. 274].) In general, "[t]he function of legal process, as that concept is embodied in the Constitution, and in the realm of factfinding, is to minimize the risk of erroneous decisions. Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error." (*Greenholtz* v. *Nebraska Penal Inmates* (1979) 442 U.S. 1, 13 [60 L.Ed.2d 668, 679, 99 S.Ct. 2100].)

Although the United States Supreme Court has never determined the constitutionality of impeaching an accused with his prior felony convictions, the courts of California have found no due process infringements. (*People* v. *Beagle, supra,* 6 Cal.3d 441, 454; *People* v. *Roberts* (1966) 65 Cal.2d 514, 522 [55 Cal.Rptr. 412, 421 P.2d 420]; *People* v. *Modesto* (1965) 62 Cal.2d 436, 454 [42 Cal.Rptr. 417, 398 P.2d 753]; *People* v. *Pike* (1962) 58 Cal.2d 70, 93 [22 Cal.Rptr. 664, 372 P.2d 656]; *People* v. *Harris* (1971) 20 Cal.App.3d 534, 538 [97 Cal.Rptr. 883]; *People* v. *House* (1970) 12 Cal.App.3d 756, 763-764 [90 Cal.Rptr. 831], disapproved on other grounds in *People* v. *Beagle, supra,* 6 Cal.3d at pp. 451-452.) Early cases in this line addressed the potential and undue penalty suffered by a defendant testifying as a witness in his own behalf when prior felony convictions were introduced for impeachment. These courts found no violations under the Sixth and Fourteenth Amendments and generally held: "[t]he defendant must weigh the danger of impeachment by the introduction of prior convictions for every witness he calls for the defense. 'The fact that the witness may also be the defendant makes the choice more difficult but a denial of due process does not emerge from the circumstances.' [Citation.]" (*People* v. *Modesto, supra,* 62 Cal.2d at p. 454.)

However, since 1967 the California courts have relied heavily on *Spencer* v. *Texas* (1967) 385 U.S. 554 [17 L.Ed.2d 606, 87 S.Ct. 648], for consti-

tutional analysis of impeachment questions. (See *People* v. *House, supra,* 12 Cal.App.3d 756, 763-764.) In *Spencer,* the Supreme Court faced the question of whether the use of prior felony convictions in a single-stage recidivist proceeding violated the due process clause. In finding the recidivist proceeding constitutionally firm, the Supreme Court analogized to the use of prior convictions for impeachment. The court suggested the potential prejudice of impeachment evidence is acceptable when it is "particularly *probative*" of a defendant's credibility and "[t]he defendant's interests are protected by limiting instructions [citation] and by the *discretion* residing with the trial judge to limit or forbid the admission of particularly prejudicial evidence even though admissible under an accepted rule of evidence." (*Spencer* v. *Texas, supra,* 385 U.S. at pp. 560-561 [17 L.Ed.2d at pp. 612-613], italics added.) Though dictum, the Supreme Court's statement reemphasizes the need to control evidence to assure a fundamentally fair trial.

The People's position also finds no support in a hypothetical application of the specific test in *Spencer.* In its holding, the court stated: "In the face of the legitimate state purpose and the long-standing and widespread use that attend the procedure under attack here, we find it impossible to say that because of the possibility of some collateral prejudice the Texas procedure is rendered unconstitutional under the Due Process Clause as it has been interpreted and applied in our past cases." (*Spencer* v. *Texas, supra,* 385 U.S. at p. 564 [17 L.Ed.2d at p. 614].) Although *Spencer* did not specify the particular state interest at issue (see *id.,* at p. 570 [17 L.Ed.2d at pp. 617-618] (dis. opn. of Warren, C. J.)), we perceive of no legitimate state interest furthered by the uncontrolled admission of irrelevant and prejudicial prior felony convictions. (See generally, Mendez, *California's New Law on Character Evidence: Evidence Code Section 352 and the Impact of Recent Psychological Studies* (1984) 31 UCLA L.Rev. 1003.) To require prior convictions be relevant to credibility places no greater burden on impeachment evidence than any other type of evidence. Further, as stated by Chief Justice Warren in his dissent in *Spencer:* "While this Court has never held that the use of prior convictions to show nothing more than a disposition to commit crime would violate the Due Process Clause of the Fourteenth Amendment, our decisions exercising supervisory power over criminal trials in federal courts, as well as decisions by courts of appeals and of state courts, suggest that evidence of prior crimes introduced for no purpose other than to show criminal disposition would violate the Due Process Clause." (*Spencer* v. *Texas, supra,* 385 U.S. at pp. 572-574 [17 L.Ed.2d at pp. 619-620], fns. omitted.) [End of adopted quote from opn. by Work, J.]

## II.

In adopting moral turpitude as the standard for determining which felonies are admissible to impeach the credibility of a witness, the majority create

enormous problems for our trial courts. Rather than providing clear guidance, the majority promulgate a rule which is guaranteed to have no certainty of application.

This court has recognized that "moral turpitude" is an "elusive concept incapable of precise general definition." (*In re Higbie* (1972) 6 Cal.3d 562, 569 [99 Cal.Rptr. 865, 493 P.2d 97].) That it is "elusive" is evident from its various judicial definitions.

"One dramatic exposition of the term was rendered by this court in 1938, and has since been consistently followed: 'an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow-men, or to society in general, contrary to the accepted and customary rule of right and duty between man and man.' (*In re Craig* (1938) 12 Cal.2d 93, 97 [82 P.2d 442]; see also *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 73 [64 Cal.Rptr. 785, 435 P.2d 553]; *In re Boyd* (1957) 48 Cal.2d 69, 70 [307 P.2d 625].)" (*In re Higbie, supra,* 6 Cal.3d at p. 569.)

"Moral turpitude has also been described as any crime or misconduct committed without excuse (*In re Hallinan* (1954) 43 Cal.2d 243, 251 [272 P.2d 768]; *In re Rothrock* (1940) 16 Cal.2d 449, 453 [106 P.2d 907, 131 A.L.R. 226]), or as any 'dishonest or immoral' act, not necessarily a crime. [Citation.]" (*In re Higbie, supra,* 6 Cal.3d at pp. 569-570.)

It has also been defined as " 'everything done contrary to justice, honesty, modesty, or good morals.' [Citations.]" (*In re McAllister* (1939) 14 Cal.2d 602, 603 [95 P.2d 932]; *In re Hatch* (1937) 10 Cal.2d 147, 150 [73 P.2d 885].) In short, " '[t]here is no hard and fast rule as to what constitutes moral turpitude.' " (*Id.,* at p. 151.)

It is clear from the various definitions that the term "moral turpitude" lacks legal precision. As one commentator stated, "[j]udicial definitions of moral turpitude are so imprecise that it is only a matter of conjecture whether a particular crime involves it." (Note, *Entrance and Disciplinary Requirements for Occupational Licenses in California* (1962) 14 Stan. L.Rev. 533, 542.) Other commentators and courts have also exposed and condemned the uncertainty of the phrase "moral turpitude."[1] (*Morrison* v.

---

[1]*United States* v. *Zimmerman* (E.D.Pa. 1947) 71 F.Supp. 534, 537 (The term moral turpitude "has never been clearly or certainly defined" and is "lacking in legal precision."); *Jordan* v. *De George* (1951) 341 U.S. 223, 235 [95 L.Ed. 886, 894, 71 S.Ct. 703, 710] (dis. opn. of Jackson, J.) ("[T]here appears to be universal recognition that [moral turpitude is] an undefined and undefinable standard."); Note, *Administrative Law: Professional and Occupational Licensing: Standard of Conduct for Administrative License Revocation* (1956) 44 Cal.L.Rev. 403, 406 (Moral turpitude is "so ill-defined as to be almost devoid of any predictability as to what is or is not moral turpitude."); Bradway, *Moral Turpitude as the Criterion of Offenses that Justify Disbarment* (1935) 24 Cal.L.Rev. 9, 19 (The term moral

*State Board of Education* (1969) 1 Cal.3d 214, 231 [82 Cal.Rptr. 175, 461 P.2d 375].)

Such an imprecise standard will cause confusion among the trial courts. Moreover, trial judges will apply their own personal views as to the mores of the community[2] in deciding whether an offense involves moral turpitude. (See *United States* v. *Zimmerman, supra,* 71 F.Supp. at p. 537.) This will inevitably lead to inconsistent results and will require the reversal of many convictions.

The experience of one of our sister states should be a lesson for this court. Although Connecticut employed the moral turpitude standard in this context for 45 years, that state eventually abandoned it because of the "uncertainty in the meaning and application of the phrase 'moral turpitude' . . . ." (*Heating Acceptance Corporation* v. *Patterson* (1965) 152 Conn. 467 [208 A.2d 341, 343-344].) The Connecticut court noted that the trial courts in that state had encountered considerable difficulty in ruling on the admissibility of prior convictions where the presence or absence of moral turpitude had to be determined. "[A] definite rule, of certain application, would eliminate problems and difficulties at the trial level, on the part of both court and counsel, which in turn lead to mistakes and costly appellate procedure, if not to actual injustice." (*Id.,* at p. 343.)

By adopting the moral turpitude standard, the majority are incorporating into the criminal law, vast bodies of noncriminal law where different applications of the term have been made.[3] In my view, the court has not considered the full implications of their actions. The following list of cases is a small sample[4] of the vast case law that this court unwittingly is incorporating into the criminal law: *Montag* v. *State Bar* (1982) 32 Cal.3d 721 [186 Cal.Rptr. 894, 652 P.2d 1370] (attorney discipline); *In re Schwartz* (1982) 31 Cal.3d 395 [182 Cal.Rptr. 640, 644 P.2d 833, 26 A.L.R.4th 1077]; *Ambrose* v. *State Bar* (1982) 31 Cal.3d 184 [181 Cal.Rptr. 903, 643 P.2d 486]; *In re Rohan* (1978) 21 Cal.3d 195 [145 Cal.Rptr. 855, 578 P.2d 102];

turpitude has a "vague, nebulous, discretionary meaning."); Note, *supra,* 14 Stan. L.Rev. at page 542 (The moral turpitude standard is "uninformative and vague."); see also Shapiro, *Morals and the Courts: The Reluctant Crusaders* (1961) 45 Minn. L.Rev. 897, 936-938.

[2]It is well established that " ' "[t]he concept of moral turpitude depends upon the state of public morals, and may vary according to the community or the times . . . ." ' " (*In re Higbie, supra,* 6 Cal.3d at p. 570; *In re Fahey* (1973) 8 Cal.3d 842, 849 [106 Cal.Rptr. 313, 505 P.2d 1369, 63 A.L.R.3d 465].)

[3]The term moral turpitude "constitute[s] only [a] lingual abstraction[] until applied to a specific occupation and given content by reference to fitness for the performance of that vocation." (*Morrison* v. *State Board of Education, supra,* 1 Cal.3d at p. 239.) Since the meaning of that term depends upon, and thus relates to, the occupation involved (*id.,* at p. 227), different applications result.

[4]A Lexis search of the term "moral turpitude" reveals over 550 cases.

*In re Calaway* (1977) 20 Cal.3d 165 [141 Cal.Rptr. 805, 570 P.2d 1223]; *In re Kristovich* (1976) 18 Cal.3d 468 [134 Cal.Rptr. 409, 556 P.2d 771]; *In re Hurwitz* (1976) 17 Cal.3d 562 [131 Cal.Rptr. 402, 551 P.2d 1234]; *In re Duggan* (1976) 17 Cal.3d 416 [130 Cal.Rptr. 715, 551 P.2d 19]; *In re Kirschke* (1976) 16 Cal.3d 902 [129 Cal.Rptr. 780, 549 P.2d 548]; *In re Honoroff* (1975) 15 Cal.3d 755 [126 Cal.Rptr. 229, 543 P.2d 597]; *In re Waisbren* (1975) 15 Cal.3d 553 [125 Cal.Rptr. 479, 542 P.2d 639]; *In re Lyons* (1975) 15 Cal.3d 322 [124 Cal.Rptr. 171, 540 P.2d 11]; *In re Kreamer* (1975) 14 Cal.3d 524 [121 Cal.Rptr. 600, 535 P.2d 728]; *In re Silverton* (1975) 14 Cal.3d 517 [121 Cal.Rptr. 596, 535 P.2d 724]; *In re Distefano* (1975) 13 Cal.3d 476 [119 Cal.Rptr. 105, 531 P.2d 417]; *In re Hanley* (1975) 13 Cal.3d 448 [119 Cal.Rptr. 5, 530 P.2d 1381]; *In re Cohen* (1974) 11 Cal.3d 416 [113 Cal.Rptr. 485, 521 P.2d 477]; *In re Wright* (1973) 10 Cal.3d 374 [110 Cal.Rptr. 348, 515 P.2d 292]; *In re Bogart* (1973) 9 Cal.3d 743 [108 Cal.Rptr. 815, 511 P.2d 1167]; *In re Fahey, supra,* 8 Cal.3d 842; *In re Higbie, supra,* 6 Cal.3d 562; *In re Plotner* (1971) 5 Cal.3d 714 [97 Cal.Rptr. 193, 488 P.2d 385]; *In re Jones* (1971) 5 Cal.3d 390 [96 Cal.Rptr. 448, 487 P.2d 1016]; *In re Langford* (1966) 64 Cal.2d 489 [50 Cal.Rptr. 661, 413 P.2d 437]; *In re Boyd* (1957) 48 Cal.2d 69 [307 P.2d 625]; *In re Hallinan* (1957) 48 Cal.2d 52 [307 P.2d 1]; *In re Hallinan* (1954) 43 Cal.2d 243 [272 P.2d 768]; *In re Rothrock* (1940) 16 Cal.2d 449 [106 P.2d 907, 131 A.L.R. 226]; *Stanford* v. *The State Bar of California* (1940) 15 Cal.2d 721 [104 P.2d 635]; *In re McAllister, supra,* 14 Cal.2d 602; *In re Craig* (1938) 12 Cal.2d 93 [82 P.2d 442]; *In re Hatch, supra,* 10 Cal.2d 147; *Jacobs* v. *The State Bar* (1933) 219 Cal. 59 [25 P.2d 401]; *Cartwright* v. *Board of Chiropractic Examiners* (1976) 16 Cal.3d 762 [129 Cal.Rptr. 462, 548 P.2d 1134] (revocation of chiropractor's license); *Hartman* v. *Board of Chiropractic, etc.* (1937) 20 Cal.App.2d 76 [66 P.2d 705]; *Morrison* v. *State Board of Education, supra,* 1 Cal.3d 214 (revocation of teacher's certificates); *Board of Trustees* v. *Judge* (1975) 50 Cal.App.3d 920 [123 Cal.Rptr. 830]; *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67 [64 Cal.Rptr. 785, 435 P.2d 553] (revocation of medical doctor's license); *Matanky* v. *Board of Medical Examiners* (1978) 79 Cal.App.3d 293 [144 Cal.Rptr. 826]; *Cadilla* v. *Board of Medical Examiners* (1972) 26 Cal.App.3d 961 [103 Cal.Rptr. 455]; *Morris* v. *Board of Medical Examiners* (1964) 230 Cal.App.2d 704 [41 Cal.Rptr. 351, 12 A.L.R.3d 1301]; *Bernstein* v. *Board of Medical Examiners* (1962) 204 Cal.App.2d 378 [22 Cal.Rptr. 419]; *Hollingsworth* v. *Board of Medical Examiners* (1961) 188 Cal.App.2d 172 [10 Cal.Rptr. 343]; *Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447 [55 Cal.Rptr. 228, 421 P.2d 76] (certification of bar admittee); *Thorpe* v. *Board of Examiners* (1980) 104 Cal.App.3d 111 [163 Cal.Rptr. 382, 8 A.L.R.4th 216] (revocation of license to practice veterinary medicine); *Golde* v. *Fox* (1979) 98 Cal.App.3d 167 [159 Cal.Rptr. 864] (revocation of real estate broker's license); *Jennings* v.

*Karpe* (1974) 36 Cal.App.3d 709 [111 Cal.Rptr. 776]; *Ring* v. *Smith* (1970) 5 Cal.App.3d 197 [85 Cal.Rptr. 227]; *Watkins* v. *Real Estate Commissioner* (1960) 182 Cal.App.2d 397 [6 Cal.Rptr. 191]; *Otash* v. *Bureau of Private Investigators* (1964) 230 Cal.App.2d 568 [41 Cal.Rptr. 263] (revocation of private investigator's license); *Rice* v. *Alcoholic Beverage etc. Appeals Bd.* (1979) 89 Cal.App.3d 30 [152 Cal.Rptr. 285] (revocation of on-sale general liquor license).

The trial courts need clear guidance as to which felonies are admissible to impeach the credibility of a witness. Today's decision not only lacks that clarity but is an open-ended invitation to judicial chaos.

Reynoso, J., concurred.

Respondent's petition for a rehearing was denied April 18, 1985. Bird, C. J., and Lucas, J., were of the opinion that the petition should be granted.